That leads us to our final case this morning, which is No. 2014-16, Monterey Research, LLC v. Vidal. Okay, Mr. Jackson. Go ahead. Thank you, Your Honor. Please support. So the key facts at issue in this case has to do with whether there is a proper motivation to combine the Salisbury and the Cullison references. And key to that decision were the Board's conclusions that in 2002, at the time of the invention, boot programs were on the order of hundreds of kilobytes, and that at the same time, instruction cache memory was on the order of a few kilobytes. And so there was the mismatch. The entire boot program couldn't fit into what was then a typical size instruction cache. And that was the motivation for making the combination of reference. The problem is there's no evidence supporting either of those two subsidiary facts in the record. The documents that the Board and the Director have pointed to in briefing here relate to the size of memory that could be used to store a program. But it doesn't go to the size of the program itself, and that's the key. Well, doesn't the size of the memory suggest the size of the program? Well, that is another inference that the Board drew, but that's not necessarily true. You can have a very small program in a large memory. There's no reason for that. In fact, the whole purpose of these multi-purpose… Why would you have a huge memory for a small program? Because you may be reusing that memory for other purposes other than the boot program. So you may be using it as cache for a much larger program. In fact, that's what the 807 patent talks about, is that you have for complex programs, you can use the multi-purpose memory as a local cache for the processor. But in the case of a boot program, which is typically much smaller, you can load the entire program into that same multi-purpose memory and not have to use that as a cache. So there's two different purposes. So when you want to use the… You're not booting very often. I mean, I think that's general knowledge. You are more typically using your computer in an operational state. And so in that state, the memory is going to be used to serve as a cache for the processor. And in that instance, you're going to want as much memory as you can afford. In 2002, it may have been, whatever, 500 kilobytes of memory. These days, of course, it's much larger. But that would be a reason why you would want a larger cache, not for the purpose of storing the boot program, but for the purpose of serving as a cache to the processor for the more complex programs. So these references, and I have them listed here, but they're also articulated in our briefing, all relate to the size of the memory, not the size of the boot program that might be stored in that memory. So there's no basis to draw that inference that somehow the size of the memory indicates something about the size of the program. In fact, none of the references talk about that. One of the references that the director pointed to relates to this gigabyte motherboard. So none of these references are saying that the memory is specific to the boot program? In the references, yes, there are some of these that are giving you the... the BIOS memory. But again, you have to allow... Well, you allow for updates, and that was... Is that the .45 megabyte BIOS file? That was the issue I was going to point out, is that in the case of this gigabyte motherboard, in 2021, which is the date that's printed on that exhibit, it talks about a .45 megabyte BIOS update file. According to the briefing, I didn't independently research this myself. That would be improper. But according to that, that's the same gigabyte motherboard that's referred to in APPX 1512, where it talks about having a 2 megabit flash ROM under the BIOS setting. So that, you know, overengineering, if you will, that BIOS memory earlier in the motherboard's life allows for later downloading of updates to the BIOS that may involve... in that a lot of these arguments were not presented in your briefing below to the board, and therefore are untimely raised. Your Honor, I don't think that these issues were untimely raised. This was the key argument below about whether you could combine these references, was whether there was this motivation. I thought your gray brief didn't acknowledge that there's some issues here that, you know, you're asking basically for forgiveness on forfeiture. Yeah, there was, I think, for the call to language that was used, it was recasting the argument in a slightly different way and arguing that justice in this case really should allow us to make the argument, even if the court were to determine that there had been a forfeiture because this was addressed at the least, at the oral argument below at the board, and both parties addressed it and the board considered it and still made its findings that there was a proper motivation to combine. Also, as to the issue about the size of the... I'm sorry, the professor, Dr. Albanese, who supported the petitioner, he opined about the size of boot programs and that they were larger than the typical instruction cache, but the exhibit that Dr. Albanese relied on, again, only shows instruction caches as being 16 kilobytes or 8 kilobytes, but it doesn't talk about the size of the boot program that would be used in that reference. There would be one in real life,  So you're saying that the reference to BIOS isn't a reference to a boot program? The boot program... Well, that's part of the issue, Your Honor. It depends on the references that you're looking at. Because if you search the Internet for a definition of BIOS, it gives you a boot program. And there was one reference that was relied upon in the briefing and at the board where it seemed to use BIOS as being distinct from the boot program. I think I have that here in my notes somewhere. So I think, again, it goes to what a person who's still in the art would have understood, and there simply wasn't any evidence really provided on that issue. If I can find that reference, I'll point it out, Your Honor. I don't see that here in my notes, Your Honor. I'm sorry. I think it may have been the Master Boot Record MBR and Why It Is Necessary article that begins at APPX 2464. In that article, it talks about how the BIOS execute a master boot record which transfers control to the boot program. That article suggests that there's a separate boot program, at least in the context of that particular article and the system it's describing, that's separate from the BIOS. I think there are other references that say that the boot aspect of the program is resident in the BIOS. So I think there's both, and I think that's part of the issue here. There wasn't a distilling of the analysis to somehow distinguish this one reference from other references that may be of record. But even in the case where you're talking about the BIOS, including the boot aspect, I forget which reference this one was, but there are other references where it shows how booting is really only one component of what that particular BIOS did. There were four or five other numbered functions. And so if you're talking about the boot program itself and the size of that, you need to be able to parse that out and analyze it and determine how much of that overall BIOS is the boot program that needs to be stored in the case of the memory so that you can get the entire boot program into that memory. And there was not concrete evidence on that. We make the argument about exhibits 1014, 1015, 1016, and 1017, which the petitioner put in in their reply brief at the board. There was no analysis of those documents by their expert either in his declaration or trial. And the board relied on those in part to come to the conclusion that there was a reason to combine. But you needed to have some sort of expert analysis or at least expert testimony on those to link the teachings of those exhibits to the motivation to combine. And that just didn't happen. It's not in the record anywhere. And finally, the board acknowledged that the combination of Cullison and Salisbury would have negatives. There was some cost associated with it,  if you just relied on the system of Salisbury. But it relied on the benefits that the petitioner pointed out to that combination. And instead of doing this weighting analysis that's required in Medicam versus Relabo that we cite in our brief, the board simply said, there are costs and benefits of the one reference. There are costs and benefits of the combination. We're going with the combination. And we think that's improper. The board needed to articulate and analyze as best it could based on the contents of the references how those costs and benefits stacked up. Did one clearly outweigh the other? Did it outweigh the other at all? And we submit that that analysis was necessary and is missing from the record. And I'm out of time, Your Honor. OK. Thank you. Thank you, Mr. Sauer. Thank you. May it please the court. There's, once again, only a single issue before the court here, and that is the board's finding as to the motivation to combine the Salisbury and Cullison references. Once again, the board's opinion is supported by substantial evidence. The board relied on both expert testimony and corroborating documentary exhibits to support its findings on the motivation to combine. Conducted an extensive analysis that spans 24 pages of the board's opinion on just the issue of motivation to combine, addressing each and every one of the arguments raised by Monterey. The expert testimony supports that there would have been motivation for one of ordinary skill in the art to combine Salisbury and Cullison because of the relatively small size of instruction caches at the time, and particularly as specified in Salisbury, one of ordinary skill in the art would see the advantages from Cullison of loading an entire group program that is larger than that very small instruction cache to the multipurpose memory. And then running it from there to prevent any problems with feeding the full group program to the instruction cache for execution. And then the expert specifically referred to a patent to support his testimony on the size of the instruction cache. The expert only testified generally that one of ordinary skill in the art would desire to make this change in order to have the option to make larger group programs available to be loaded fully into the multipurpose memory. But then the board also found corroboration for that part of the testimony in the separate documentary exhibits documenting the relative sizes of group memories at the time. The memories we're talking about, are they exclusive to group programs or are they, as Mr. Jackson suggested, general and generic memories that could accommodate key programs and other things also? So certainly the first exhibit that said APPX1274 is specifically described as a boot prom that is 512 kilobytes, so there's no suggestion that it's any other functions, and that's specifically what it's limited to. And because this argument wasn't raised in the briefing, even though these documents were submitted by Qualcomm to support Motivation to Combine and they weren't addressed in the certify, there isn't a developed argument on this issue as to why the BIOS should be parsed up as opposing counsel has just suggested. But even allowing for some of that, I think the key point here is that the board, and this goes to the issue of the boot program size versus the memory size, as well as whether BIOS can have additional functions. The board was only looking at this for some indication of the relative size of these programs compared to the instruction cache. So the instruction cache, there's no dispute, was only 8 or 16 kilobytes in all of these documents, but these boot proms are 512 kilobytes. So even if you're only using a pretty small part of that, there's still something many times larger than the 8 or 16 kilobytes that's available in the instruction cache alone. And so that supports the motivation. Even if there's, we can't be, we don't need 100% certainty about the numbers because we're looking at what is their relative size. And all the evidence shows that it was common for boot programs to be much larger than the size of the very small instruction cache. If there are no further questions. Nope, thank you. Thank you. Mr. Jackson, you have two minutes. Thank you, Your Honor. And just to clarify, I did mean to correct myself when I answered your question earlier, Judge Dyke. There are certain references that do give a memory size that is specific to the BIOS. And in my mind, I was thinking more about the 807 patent and the way it worked, and I apologize for that. I really don't have much else to say. We've addressed the issue of the forfeiture in the briefs, specifically in the reply brief, as Judge Chen pointed out. I do think that in this case, there is certainly, there is, the Board is drawing a conclusion from the evidence for which there isn't direct evidence on. Yes, there are documents showing the size of memories, and even the size of memories for blue programs, for BIOS. But that is, there is a leap from that to saying that the programs, that somehow relates to the program size, other than the program would have to be smaller. It would have to be smaller than the size of the BIOS memory that is articulated in some of these references. That's the only conclusion you can draw. You can't draw the conclusion, as the Board did, that it's necessarily larger than instruction caches, for which, again, there's very little evidence. I think there was one exhibit that was referred to as showing the size of an instruction cache that the petitions expert relied upon, and that was the patent number 6304965. But those caches were not specific caches. Those were just instruction caches generally used in that system. So that provides some information, but it's not direct to the size of whether that would be larger or smaller than boot programs. Your Honor, unless you have other questions, that's really all I have. Okay, thank you. Thank you. Thank all the counsel. Thank you, sir. And that's my question for this morning.